# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### *Southern Division*

| | | |
|---|---|---|
| CARMEN JOHNSON, | * | |
| Petitioner, | * | |
| v. | | Civil Case No.: GJH-18-3461 |
| | * | |
| UNITED STATES OF AMERICA | | Criminal Case No.: GJH-14-352 |
| | * | |
| Respondent. | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Petitioner Carmen Johnson was sentenced to 57 months of imprisonment after a jury convicted her of twenty-four counts of conspiracy to commit wire fraud, wire fraud, and making false statements in loan applications. Pending before the Court are Petitioner's Motion to Vacate pursuant to 28 U.S.C. § 2255, ECF No. 119, and a Petition for Writ of Error Coram Nobis, ECF No. 120. No hearing is necessary. *See* Loc. R. 105.6 (D. Md.). For the following reasons, Petitioner's Motion and Petition will be denied.

## I.   BACKGROUND

The Fourth Circuit reviewed the somewhat complex history of Petitioner's prosecution in an opinion affirming her convictions. *United States v. Johnson*, 683 F. App'x 241 (4th Cir. 2017). The Fourth Circuit first explained the facts proven at trial:

> Between February 2003 and July 2011, Johnson operated a so-called credit repair business known as Able Estate & Company LLC ("Able Estate"). In this role, Johnson had the ability to submit information regarding loans or lines of credit, known as tradelines, to Experian, the international credit reporting agency. Johnson fraudulently reported that Able Estate extended credit or loans to Able Estate's clients. Johnson backdated the fictitious tradelines to create the appearance that the purported credit or loans had been significantly repaid in order to improve

1

the credit profiles of the clients. In exchange, the clients paid Able Estate, that is, Johnson, a fee typically between $1,200 and $2,400.

Able Estate reported 2,850 tradelines to Experian between May 2004 and July 2006. In July 2006, suspecting Able Estate of fraud, Experian suppressed all Able Estate tradelines and reported the activity to the United States Secret Service, which opened an investigation. Meanwhile, Johnson began to use a company called Restoration One and reported 422 tradelines on behalf of Able Estate clients. Johnson hired a woman named Shirley Walker to report the fraudulent tradelines in order to avoid detection by Experian. In June 2009, suspecting Restoration One of fraud, Experian suppressed these tradelines as well. Johnson formed a third company called CJ Lending. Concealing her identity as one of the transmitters of data at CJ Lending, Johnson reported 2,229 tradelines to Experian between November 2007 and April 2008. Experian later suspected fraud and suppressed these tradelines as well.

In addition to the fraudulent credit histories described above that Johnson reported on behalf of over 2,000 clients, between March 2007 and November 2008, Johnson conspired with two licensed real estate agents to enhance the value of fraudulent real estate purchases by helping to fashion false statements (i.e., regarding purchasers' credit worthiness) on loan applications and sales contracts. Collectively, the conspiracies involved at least ten different real estate transactions.

*Id.* at 244. In 2011, investigators probing Petitioner's activities obtained warrants for her funds and records:

[O]n March 23, 2011, the Government sought and obtained a seizure warrant pursuant to 21 U.S.C. § 853(p) as part of the investigation centered specifically on Able Estate's and CJ Lending's interactions with Experian. The Government averred in the affidavit supporting the warrant application ("the March 2011 affidavit") that it would seek a money judgment in a "forthcoming indictment" and that there was probable cause to believe that up to $2 million from Able Estate's accounts at specified financial institutions were forfeitable. A United States Magistrate Judge issued the warrant and agents seized $515,967.64 from certain bank accounts of Able Estate and CJ Lending.

Days later, agents executed a separate warrant and searched the premises in which Johnson's companies were located. During the execution of the search warrant, agents located loan files for properties that showed lines of credit from CJ Lending or Restoration One. In some cases, these files contained records showing that the identities used to purchase properties possessed no credit histories at all and were based on fabricated tradelines.

*Id.* at 245 (citation omitted).

Johnson was eventually named in two indictments stemming from the conspiracies she entered with the real estate agents between March 2007 and November 2008:

> In Case 13-cr-00294 ("Case 13-294"), Johnson, real estate agent Edgar Tibakweitira ("Tibakweitira"), and several other co-conspirators used false identities and false credit information to obtain mortgage loans to purchase residential properties. The identities Tibakweitira selected to use as straw buyers were often individuals located in Tanzania. Tibakweitira paid Johnson to fabricate credit histories for the straw buyers in order to ensure that they had sufficient credit to qualify for a mortgage loan. Tibakweitira then submitted Uniform Residential Loan Applications to lenders that included the fabricated credit histories so that the loans would be approved. Tibakweitira also created false addenda to the sales contracts, representing that Destiny Property Management, LLC did renovations to residential properties, when in fact Destiny never did any renovations. This caused the lending banks to disburse funds at the closings based upon inflated appraisals of the property values. Johnson, Tibakweitira, and the conspirators shared in the proceeds generated by the scheme.

> In Case 14-cr-00352 ("Case 14-352"), Johnson and real estate agent Nsane Phanuel Ligate ("Ligate") used false identities and false credit information to obtain mortgage loans in a similar scheme. Ligate reported that Xavier Engineering and Construction Company, a company owned by a co-conspirator, completed restorations to the properties. In reality, Xavier Engineering never worked on the properties, and the conspirators pocketed the proceeds generated by the mortgage loans.

*Id.* at 244–45.[1]

"In the course of pre-trial proceedings in Case 13-294, on December 19, 2013, Johnson filed a motion for release of the funds that had been seized from the accounts of Able Estate and CJ Lending in March 2011. Acting through retained counsel, Johnson claimed that she did not have the funds to pay for her legal representation. According to Johnson, she was entitled to the seized funds because they were 'untainted' assets she should be permitted to use to fund her defense." *Id.* at 245. Following a non-evidentiary hearing, Judge Chasanow of this Court denied

---

[1] Petitioner was the sole defendant in either of the indictments to go to trial. *Johnson*, 683 F. App'x at 245 n.1.

the motion. *Id.* at 246 (citing *United States v. Johnson*, No. DKC 13-0294, 2014 WL 2215854, at *1 (D. Md. May 28, 2014)). As the Fourth Circuit explained, Judge Chasanow found that "the March 2011 affidavit provided an ample basis for the magistrate judge's finding of probable cause and the Government had easily and quite readily satisfied the relevant standards." *Id.* (citing *Johnson*, 2014 WL 2215854, at *5–*6).

Petitioner's retained counsel then successfully moved to withdraw and Petitioner elected to proceed *pro se*. *Id.* The Court appointed Anthony Martin, Esq. as standby counsel on August 8, 2014, and Martin agreed that he would be prepared to represent Petitioner at trial, if necessary. *Id.*; see ECF No. 17.[2] On August 13, the Court held a hearing pursuant to *Faretta v. California*, 422 U.S. 806 (1975), found that Petitioner knowingly and voluntarily waived her right to counsel, ordered that Martin would serve as standby counsel only, and set trial to begin on October 20, 2014. ECF Nos. 22, 106. On September 30, 2014, however, after Petitioner submitted several *pro se* filings expressing "sovereign citizen" beliefs, the Government moved for a psychological evaluation and a hearing to determine Petitioner's competence to proceed to trial. ECF No. 32. The Court granted the motion following a hearing on October 10, 2014, continued the trial date, and set a competence hearing for December 5, 2014. ECF No. 41.

At the Government's recommendation, Petitioner was evaluated by Dr. Neil Blumberg, who completed a lengthy report concluding that Petitioner was competent to stand trial. ECF No. 43; ECF No. 130. The Court accepted that finding at the competency hearing and set trial to begin on February 10, 2015. ECF Nos. 47, 48. The Court also conducted an additional *Faretta* colloquy with Petitioner at the hearing and confirmed that she had knowingly and voluntarily waived the right to counsel, although the Court strongly urged Petitioner not to represent herself.

---

[2] Citations to documents appearing on the Court's electronic filing system (CM/ECF) refer to docket entries in Case No. 14-352.

ECF No. 104 at 9–15.[3] The Court reaffirmed that Martin would serve as standby counsel and reminded Petitioner that Martin was available to her for that purpose. *Id.* at 15.

At a pretrial conference on February 3, 2015, the Court again explained Martin's role at trial, instructed Petitioner that the Court would not postpone the trial if Petitioner decided that she would like a new attorney, and directed Martin to be prepared to represent her if requested. ECF No. 105 at 14. Three days later, however, Martin filed a motion to delay the trial because Petitioner had decided earlier that day that she would like him to represent her and he had not yet been able to review the evidence because Petitioner had refused to discuss the case with him until that time. ECF No. 54. The Court denied the motion on February 9, 2015, ECF No. 56, and the trial began the next day. Summarizing its position in its opening statement, the Government contended that Petitioner "fabricated credit histories" as part of two "criminal scheme[s] to defraud banks out of hundreds of thousands of dollars in mortgage loans for properties" that the conspirators "never intended to live in." ECF No. 95 at 143.

The Government called twenty-five witnesses, including Petitioner's former employee Janel Jackson and former client Shirley Butler-Walker, each of whom testified about Able Estate's credit repair business. ECF No. 96 at 13, 17–18, 77–78. The Government also called real estate agents Edgar Tibakweitira and Nsane Phanuel Ligate, who had previously pleaded guilty for their roles in the schemes for which Petitioner was charged. Tibakweitira testified that he would bring Petitioner the names of property buyers and that, for a fee, she would falsely report to credit bureaus that she had made them loans or extended them credit in order to improve their credit scores. ECF No. 97 at 97–100. Tibakweitira would then include the loans or lines of credit on fraudulent loan applications. *Id.* at 106–07. Tibakweitira testified that Petitioner's "role" in

---

[3] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

the scheme was to "work in putting the trade lines on the credit" and that she "was pretty much needed on doing the credit" in order for him to be able to acquire properties. *Id.* at 114, 120. Ligate testified similarly, explaining that he paid Petitioner to create false trade lines for the putative buyer of two fraudulently purchased properties. ECF No. 98 at 40, 45–46, 71.

The Government also called Ronnyne Bannister, a Special Agent in the Office of the Inspector General of the U.S. Department of Housing and Urban Development. ECF No. 99 at 10–11. Agent Bannister testified to an interview with Petitioner on March 29, 2011 at Petitioner's home in which Petitioner recalled dealings with Tibakweitira and was questioned about specific individuals who purchased homes with no credit history other than trade lines created by CJ Lending or Able Estate. *Id.* at 180–82. After Petitioner admitted that she was paid to create those credit histories, Agent Bannister testified, Petitioner "became emotional and stated that she learned in 2006, 2007, and 2008 that mortgage fraud was being facilitated through the use of her companies," that "some of the individuals whose identities were used were dead people or stolen identities," and that while "she tried getting out of the credit repair business for a few years" after these revelations, "she had been talked out of it by people because the business was so lucrative." *Id.* at 183.

Defense counsel called three witnesses, two of whom were character witnesses who testified briefly to Petitioner's reputation for truthfulness. ECF No. 100 at 139–40, 143–44. Petitioner also testified in her defense, discussing Able Estate's credit restoration, debt management, identity fraud, and household budgeting services, as well as her methods of addressing her customers' credit issues, which often involved adding clients to her personal credit cards. *Id.* at 30–37. Petitioner also testified about her employment of Janel Jackson, noting that Jackson had the ability to create trade lines using Petitioner's account information. *Id.* at 40.

6

Petitioner further noted that any realtors, banks, or underwriters could acquire her Experian credentials, which would appear on certain credit reports, and could use them to amend, correct, or manipulate a trade line. *Id.* at 41.

Finally, Petitioner testified at length about her ex-fiancé and business partner Charles Parker, with whom she formed CJ Lending, of which he was the president. *Id.* at 53–56. While the business was operating, Parker was able to create trade lines and had a membership with Experian, which Petitioner did not. *Id.* at 56–57. According to Petitioner, while she and Parker were initially co-owners of CJ Lending's bank account, Parker eventually removed her from the account and attempted to steal the money it contained. *Id.* at 56. Parker also stole a binder containing promissory notes and other documentation of loans made by Able Estate. *Id.* at 71. Petitioner testified that Parker generally "was just out of control" and "was doing so much stuff" of which she was unaware, including manipulating her digital and paper files. *Id.* at 69–70. Eventually, Petitioner sold her shares in CJ Lending to Parker, though he failed to pay for them, and similarly failed to repay a personal loan she made to his family. *Id.* at 70.

On February 20, 2015, the jury returned a guilty verdict on each of the twenty-four counts with which Petitioner was charged, including two counts of conspiracy to commit wire fraud, twelve counts of wire fraud, and ten counts of making a false statement in a loan application. ECF No. 72. Following her conviction, Petitioner retained a new attorney, Robert Bonsib, and filed a motion for a new trial, premised mainly on the Court's denial of Petitioner's motion for a continuance four days before the trial began. ECF No. 75. The Court denied the motion from the bench following a hearing on June 3, 2015. ECF No. 85; ECF No. 102 at 78.

The Court then held Petitioner's sentencing hearing. The Government called Special Agent Bannister to testify to the financial loss suffered by mortgage lenders, including federal

housing agencies, as a result of the fraudulent loans for which Petitioner had provided false credit histories. ECF No. 102 at 82. The total loss figure, which was the sum of the actual losses reported by the lenders and agencies after the properties at issue were resold in foreclosure, was $2,315,660.94. *Id.* at 84. The Government accordingly requested that amount in restitution. *Id.* at 126. On cross-examination, Special Agent Bannister explained that all of the properties "sold well below the price that they were sold at for the transactions that were involved" and that the loss amounts provided by the lenders also included other expenses beyond just the difference in sale price, including property marketing and management costs, closing agent and selling broker fees, and other miscellaneous sales expenses. *Id.* at 84–86, 90.

Petitioner argued that her role in the mortgage fraud scheme was merely tangential, that the total loss amounts were not reasonably foreseeable to her, and that the proper amount to be paid in restitution was merely the fees she received for her services, totaling between $10,000 and $30,000. *Id.* at 111–12. The Court concluded, however, that the loss amount of $2,315,660.94 was established by at least a preponderance of the evidence and that the amount was reasonably foreseeable to Petitioner. *Id.* at 120. After calculating the applicable sentence range under the U.S. Sentencing Guidelines, the Court imposed a sentence of 57 months followed by five years of supervised release. *Id.* at 123, 166. The Court also found that the $2,315,660.94 in restitution that the Government had requested was the appropriate amount and ordered that it was due and payable immediately. *Id.* at 167. Following the sentencing hearing, on October 5, 2015, the Government filed a motion seeking to apply the money seized from Petitioner in March 2011 toward Petitioner's restitution debt. ECF No. 93. Petitioner filed no opposition and the Court granted the motion on January 7, 2016. ECF No. 107.

As noted previously, Petitioner filed a direct appeal to the Fourth Circuit and raised four arguments, each of which was rejected in an opinion issued on April 3, 2017. First, Petitioner challenged Judge Chasanow's denial of her motion for return of her seized assets, arguing that the Court applied the wrong analyses in assessing the motion and erred in finding that the seizure was part of an investigation of conduct separate from the schemes for which Petitioner was indicted. *See Johnson*, 683 F. App'x at 247. The Fourth Circuit disagreed, finding that the Court did not clearly err in holding that the seizure was pursuant to a separate investigation, nor in finding that the Government had probable cause to seize Petitioner's assets as tainted funds. *Id.* at 249–50. Responding to Petitioner's argument that the seizure deprived her of her right to counsel of her choice, the Fourth Circuit explained that Petitioner had failed to sufficiently show that the seized assets were untainted and emphasized that she had no right to use illegally obtained funds to hire an attorney. *Id.* at 250.

Petitioner next argued that this Court erred in denying her motion for a continuance because her standby counsel lacked sufficient time to prepare for the trial. *Id.* The Fourth Circuit found that the Court was well within its discretion to deny the continuance, noting that the Court had repeatedly urged Petitioner not to represent herself and explicitly warned her that she would not be granted a continuance if she changed her mind, thus placing any fault for lack of trial preparation on Petitioner and her counsel. *Id.* at 251. The Fourth Circuit also found that Petitioner failed to establish prejudice from the denial of the continuance, stating that "[w]e fail to see how Johnson would have developed additional defenses with more time." *Id.* The Fourth Circuit noted this Court's observation in its oral ruling denying Petitioner's new trial motion that her trial counsel "provided a vigorous defense" and challenged the Government's witnesses during cross-examination. *Id.*; *see* ECF No. 102 at 75.

9

Petitioner's third argument challenged the sufficiency of the evidence, mainly on the ground that the Government lacked evidence that she was a knowing and willing participant in a conspiracy to defraud lenders because she did not know the purpose of the conspiracy. *Johnson*, 683 F. App'x at 251–52. The Fourth Circuit found that there was substantial evidence to conclude that Petitioner "was actively engaged in a fraudulent scheme to pull money out of real estate transactions" and that her role was limited but "nonetheless a key element of the conspiracy." *Id.* at 252. The Fourth Circuit particularly highlighted the testimony of Tibakweitira, Ligate, and Agent Bannister as establishing Petitioner's knowledge of the purpose of the false credit histories she was creating, concluding that "the evidence amply supports the conclusion that Johnson was an active and knowing participant in the conspiracy for which she was convicted." *Id.* at 252–53.

Petitioner finally argued that the loss amount adopted at sentencing was not attributable to her. *Id.* at 253. The Fourth Circuit disagreed. Noting that members of a conspiracy can be held accountable at sentencing for the entire foreseeable loss caused by the conspiracy or scheme, the Fourth Circuit found that Petitioner knowingly assumed the risk that the home buyers whose credit histories she fabricated would not be able to pay their loans and that the homes would go into foreclosure, thus rendering foreseeable the losses the lenders suffered. *Id.* at 253–54. The Fourth Circuit thus rejected all of Petitioner's arguments and affirmed this Court's judgment. *Id.* at 254.

Petitioner filed a petition for a writ of certiorari with the U.S. Supreme Court that was denied on November 6, 2017. 138 S. Ct. 421 (2017). On November 6, 2018, represented by new counsel, Petitioner filed a Motion to Vacate pursuant to 28 U.S.C. § 2255, ECF No. 119, and a Petition for Writ of Error Coram Nobis, ECF No. 120. On February 8, 2019, after successfully

applying for leave from the Court, Petitioner filed an additional memorandum in support of her Motion to Vacate. ECF No. 127. On March 25, 2019, the Government filed a Response in opposition to both filings. ECF No. 128. According to the Federal Bureau of Prisons' inmate locator database, Petitioner was released on May 14, 2019. Federal Bureau of Prisons Inmate Locator, https://www.bop.gov/inmateloc/. Petitioner filed a Reply in support of her filings on May 17, 2019. ECF No. 136.

## II.    DISCUSSION

The Court first considers the Motion to Vacate, ECF No. 119, before turning to the Petition for Writ of Error Coram Nobis, ECF No. 120. The Court notes that although Petitioner appears to have been released from incarceration, the parties have not alerted the Court to any change in Petitioner's status that would impact the pending motions. Accordingly, the Court proceeds to considering the Motion to Vacate.

### A.  Motion to Vacate

To be entitled to relief under 28 U.S.C. § 2255, a petitioner must prove by a preponderance of the evidence that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Where a § 2255 petition, along with the files and records of the case, conclusively shows that the petitioner is not entitled to relief, a hearing on the motion is unnecessary and the claims raised therein may be dismissed summarily. 28 U.S.C. § 2255(b). Petitioner here asserts four grounds for relief, which the Court now considers in turn.

### 1. Ineffective Assistance of Counsel

Petitioner's first two grounds assert that her trial counsel was ineffective for failing to investigate and present exculpatory witnesses and documents. ECF No. 119 at 4; ECF No. 127 at 24–28. "To state a claim for relief under 28 U.S.C. § 2255 based on a Sixth Amendment claim of ineffective assistance of counsel, Petitioner must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 671 (1984)." *Choi v. United States*, Nos. RDB-12-0066, RDB-16-3985, 2018 WL 620454, at *2 (D. Md. Jan. 30, 2018). "The first, or 'performance' prong, requires a showing that defense counsel's representation was deficient and fell below an 'objective standard of reasonableness.'" *Id.* (quoting *Strickland*, 466 U.S. at 688). A "deficient performance" is one in which counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment," *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 687). Courts are "highly deferential" to counsel's tactical decisions and petitioners must overcome the presumption that the challenged action falls within "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

"The second, or 'prejudice' prong, requires [a petitioner] to demonstrate that [her] counsel's errors deprived [her] of a fair trial." *Choi*, 2018 WL 620454, at *2 (quoting *Strickland*, 466 U.S. at 687). The petitioner "must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 694). "The Fourth Circuit has noted that there is no reason to address both prongs of the *Strickland* test if the defendant makes 'an insufficient showing on one.'" *Choi*, 2018 WL 620454, at *2 (quoting *Moore v. Hardee*, 723 F.3d 488, 500 (4th Cir. 2013)). "Thus, ineffective assistance of counsel claims may be disposed

of based solely on a failure to satisfy either the 'performance' prong or the 'prejudice' prong."
*Id.* (citing *Strickland*, 466 U.S. at 697).

Petitioner first argues that her trial counsel failed to undertake a constitutionally adequate investigation by failing to investigate and call certain exculpatory witnesses. ECF No. 127 at 24. She focuses on two witnesses, Eugene Stevenson and Kerry Armand Davila, declarations from whom are attached to the memorandum in support of Petitioner's Motion to Vacate. ECF Nos. 127-1, 127-2. Stevenson declares that Petitioner and Able Estate contracted him to prepare tax documents between 2001 and 2015 and that he is accordingly familiar with the lawful services Petitioner offered. ECF No. 127-1 ¶¶ 1, 3. Stevenson also states that he was aware of Charles Parker's role in Petitioner's businesses and that Parker never paid Petitioner for the shares of CJ Lending that he purchased from her. *Id.* ¶¶ 4–5.

Davila declares that he was contracted by Petitioner and Able Estate between 2003 and 2015 to assist with the company's information technology. ECF No. 127-2 ¶ 1. Davila echoes Stevenson's testimony that Able Estate performed several legitimate services and further declares that Petitioner was "extremely meticulous about her accounting," "was acutely aware of the possibility she might face an audit," and thus "kept careful records and took great pains to make sure that her business practices were legitimate." *Id.* ¶¶ 3–4. Davila also discusses Parker's role in CJ Lending, including his failure to pay for Petitioner's shares, and adds that Parker stole money from Petitioner and Able Estate, entered CJ Lending's office without Petitioner's knowledge despite ostensibly having abandoned the business, tampered with electronic documents stored on Petitioner's computers, and confronted Davila when he encountered new computer security measures Davila had added. *Id.* ¶¶ 5–11.

13

Petitioner argues that testimony from these witnesses about her business practices and involvement with Parker would have strengthened the legitimacy of her business in the eyes of the jury and "humanized" her, and "would have given [Petitioner] a viable defense to the allegation that she back dated the trade lines." ECF No. 127 at 20–21, 26. Whatever the accuracy of these assertions, they are insufficient to establish prejudice under *Strickland* for several reasons. First, the substance of the hypothetical testimony has relatively little to do with the primary evidence in the case. As described previously, Tibakweitira and Ligate testified, supported by documentary evidence, that they paid Petitioner to create false credit histories indicating that she had made loans to individuals whose names Tibakweitira and Ligate provided so they could obtain mortgage loans. ECF No. 97 at 97–100; ECF No. 98 at 45–46, 71. Agent Bannister further testified that Petitioner admitted that she knew her company was facilitating mortgage fraud and that Tibakweitira used her services to create false credit histories for real estate buyers. ECF No. 99 at 180–83.

Petitioner fails to address this evidence in her ineffective assistance arguments or to explain how the testimony counsel failed to offer would have reduced its weight and created a reasonable probability of a different outcome. Notably, none of the Government's witnesses described Parker as playing any role in the transactions for which Petitioner was charged, reinforcing the lack of a connection between the evidence Petitioner argues should have been introduced and the core evidence against her. Additionally, the fact that the jury could have heard further testimony that Petitioner's businesses performed lawful services has little bearing on the key evidence in the case. It would be unremarkable for a jury to find that Petitioner offered legitimate financial services but also participated in a mortgage fraud scheme involving the same skills and expertise.

14

In addition, evidence of Petitioner's lawful business practices was introduced in testimony by Petitioner's former employee Janel Jackson and former client Shirley Butler-Walker, each of whom addressed Able Estate's credit repair services. ECF No. 96 at 13, 17–18, 77–78. Petitioner also testified extensively about the services she provided. ECF No. 100 at 30–37. As for Parker, Petitioner testified at length about his role in CJ Lending, including the fact that he was able to create trade lines. *Id.* at 53–56, 69–71. Accordingly, it is unclear how apparently cumulative testimony by Stevenson and Davila on these topics would have led to a different outcome in the trial. In general, "[n]o adverse effect results from a trial lawyer's decision not to call witnesses whose testimony would be cumulative." *United States v. Dehlinger*, 740 F.3d 315, 324 (4th Cir. 2014); *see also Moody v. Polk*, 408 F.3d 141, 154 (4th Cir. 2005) (stating that prejudice from alleged ineffective assistance of counsel "does not exist simply because more corroborating evidence could have been presented").

Nor can Petitioner establish prejudice from trial counsel's failure to introduce documents. Petitioner argues that introducing evidence that other individuals could have manipulated trade lines using a certain software program, and that Petitioner merely extended loans to clients, "would have undercut any argument that [Petitioner] joined the conspiracy, had the specific intent to defraud, or caused any false statement to be made on a loan application," and thus "could have exonerated her." ECF No. 127 at 27. This argument is unpersuasive because Petitioner again fails to explain how this evidence would have been likely to change the outcome of the trial. Importantly, counsel elicited testimony from Petitioner that a variety of other individuals could use her Experian account information to manipulate trade lines, ECF No. 100 at 41, and counsel highlighted this testimony in his closing statement, arguing that Tibakweitira and Ligate, as well as Jackson, had the ability to manipulate documents and trade lines, ECF No.

101 at 61–63. Petitioner also does not explain how evidence about trade line software could or should have been introduced, but it appears likely that any such presentation would have required testimony from Petitioner to explain the software to the jury, with the result that the evidence would have been impacted by any credibility judgments of Petitioner that the jury may have made. Accordingly, it is not reasonably likely that this evidence would have swayed the jury in light of the testimony by Tibakweitira and Ligate directly implicating Petitioner in their conspiracies, as well as Agent Bannister's testimony about Petitioner's admissions.

Finally, even if Petitioner could establish prejudice stemming from either alleged failure by trial counsel, she cannot establish that counsel's performance was constitutionally defective. Under *Strickland*, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 466 U.S. at 689. In assessing investigations by counsel, courts must "conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citation omitted) (quoting *Strickland*, 466 U.S. at 688–89).

The record demonstrates that trial counsel's investigation involved several steps that together easily satisfy the low threshold of review. Counsel employed an investigator and issued witness subpoenas, ECF No. 98 at 152; considered a lengthy list of potential witnesses, including Stevenson and Davila, ECF No. 95 at 25, though some of the witnesses were out of state or unavailable, ECF No. 99 at 185; and, as the Court noted at sentencing, was able to provide "a vigorous defense, cross-examining all of the Government's substantive witnesses," ECF No. 102

16

at 75. The Court particularly highlighted counsel's cross-examination of Tibakweitira, which was "not only vigorous but somewhat effective" and part of a "vigorous and aggressive defense." ECF No. 102 at 75. To the extent that Petitioner's complaint at this stage is ultimately about trial counsel's lack of time to prepare, that remains the result of Petitioner's own decision not to discuss her case with counsel until just days before trial. And like the Fourth Circuit found in affirming the denial of Petitioner's new trial motion, the Court "fail[s] to see how Johnson would have developed additional defenses with more time." *Johnson*, 683 F. App'x at 251.

On review of the trial record, the Court cannot conclude that trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687). Therefore, because Petitioner has satisfied neither prong of the *Strickland* test, her ineffective assistance of counsel claims will be denied.

### 2.  Incompetence to Stand Trial

In her third ground for relief, Petitioner argues that, because she was taking large doses of the psychotropic drug Klonopin in the eighteen months prior to trial, she was incompetent to stand trial. ECF No. 119 at 7; ECF No. 127 at 28. "The test for determining competency in a federal court is whether the defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as a factual understanding of the proceedings against him.'" *United States v. Basham*, 789 F.3d 358, 379 (4th Cir. 2015) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (per curiam)). "Competency determinations turn only on the defendant's capacity to understand the proceedings, the capacity to assist in his defense, and the capacity to communicate with counsel, and not on his willingness to do so." *United States v. Jenkins*, 311 F. App'x 655, 656 (4th Cir.

2009). A § 2255 petitioner claiming that he was tried and convicted while mentally incompetent "is presumed to have been competent during his trial" and "bears the burden of proving, by a preponderance of the evidence, that he was incompetent." *Basham*, 789 F.3d at 379 (citations omitted).

"[A] claim of incompetency to stand trial asserted for the first time in a federal habeas petition is subject to procedural default." *Smith v. Moore*, 137 F.3d 808, 819 (4th Cir. 1998); *see also Basham*, 789 F.3d at 379 n.10. "The scope of a § 2255 collateral attack is far narrower than an appeal, and a 'collateral challenge may not do service for an appeal.'" *Johnson v. United States*, 424 F. Supp. 3d 434, 439 (D. Md. 2019) (quoting *Foster v. Chatman*, 136 S. Ct. 1737, 1758 (2016)). "Thus, procedural default will bar consideration under § 2255 of any matters that 'could have been but were not pursued on direct appeal, [unless] the movant . . . show[s] cause and actual prejudice resulting from the errors of which he complains.'" *Id.* (alterations in original) (quoting *United States v. Pettiford*, 612 F.3d 270, 280 (4th Cir. 2010)).

The Government argues that Petitioner could have raised her competence claim in her direct appeal of her conviction and that she is therefore barred from doing so now. ECF No. 128 at 17. Petitioner's only response is that the record on appeal lacked sufficient development to raise the claim and that the Court should look to statements in her Motion to Vacate regarding her Klonopin use. ECF No. 136 at 5. But "[t]he existence of cause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel." *Pettiford*, 612 F.3d at 280 (quoting *United States v. Mikalajunas*, 186 F.3d 490, 492–43 (4th Cir. 1999)). Petitioner's conclusory references to an underdeveloped record and novel assertions about overmedication fall far short of this substantial threshold. Accordingly, Petitioner's competence claim is procedurally defaulted.

18

Even if Petitioner could assert the claim at this stage, however, it is plainly meritless. The Court determined that Johnson was competent less than three months before trial, after reviewing the report of a Court-ordered psychiatric evaluation that took place less than four months before trial. ECF No. 104 at 4–5. While the examining physician, Dr. Neil Blumberg, specifically noted that Petitioner reported use of Klonopin prescribed by her primary care physician, the report includes no indication that the drug impaired Petitioner's ability to process, understand, or retain information. ECF No. 130 at 2–3. Instead, Dr. Blumberg found Petitioner intelligent, articulate, and able to understand the nature and consequences of the proceedings against her and to assist in her defense and work with counsel if she chose to do so. *Id.* at 7–8. Notably, Dr. Blumberg stated an opinion that Petitioner's expression of sovereign citizen beliefs was an attempt to avoid prosecution rather than a sign of a mental health issue. *Id.* at 7–8.

Further undercutting Petitioner's claim are the assessments of Petitioner's competence that the Court made during the trial. During a bench conference on the third day of trial, the Court stated for the record that Petitioner "has behaved herself perfectly fine and has seemed very engaged with her attorney." ECF No. 97 at 122. The Court also noted that it had observed several discussions between Petitioner and her counsel, suggesting "that she is completely lucid and understanding what's going on." *Id.* at 122–23. Petitioner has provided no evidence or reason for the Court to now question its own observations or to doubt the reliability of Dr. Blumberg's report. Petitioner merely cites "her incoherent statements prior to trial," presumably referring to her expression of sovereign citizen beliefs. ECF No. 127 at 29. But it was precisely because of those statements that the Court ordered a psychological evaluation, though the Court remained "far from convinced that the defendant actually has a mental health condition." ECF

19

No. 103 at 17. And that evaluation confirmed Petitioner's competence to stand trial.

Accordingly, Petitioner's claim fails on both procedural and substantive grounds.

### 3.   Sixth Amendment Deprivation of Funds

In the final ground raised in her Motion to Vacate, Petitioner argues that the Government

deprived her of her Sixth Amendment right to counsel of her choice by wrongfully retaining the

funds it had seized from her companies in March 2011. ECF No. 119 at 8; ECF No. 127 at 29.

"The Supreme Court has recognized a right to trial counsel of choice under the Sixth

Amendment." *United States v. Marshall*, 872 F.3d 213, 218 n.7 (4th Cir. 2017) (citing *United

States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006)). Petitioner argues that the Government

wrongfully represented that her funds were seized pursuant to an investigation unconnected to

the charged offenses and never issued the indictment in that investigation that it repeatedly

represented was "forthcoming." ECF No. 127 at 30. Petitioner further asserts that conduct

described in the March 2011 affidavit is indistinguishable from the conduct for which she stood

trial. *Id.*

As Petitioner is forced to acknowledge, however, she raised essentially this same claim in

her direct appeal, and it was definitively rejected by the Fourth Circuit. *Id.* A defendant "cannot

'circumvent a proper ruling . . . on direct appeal by re-raising the same challenge in a § 2255

motion.'" *United States v. Dyess*, 730 F.3d 354, 360 (4th Cir. 2013) (quoting *United States v.

Linder*, 552 F.3d 391, 396 (4th Cir. 2009)). Petitioner insists that "on the unique facts of this

case, where the Government succeeded on appeal by claiming—falsely—that Ms. Johnson's

funds were seized pursuant to a separate investigation," the Court should "consider the

deprivation of her right to counsel of her choice in deciding the fate of her Motion to Vacate."

ECF No. 127 at 30.

The Court will decline this invitation. Petitioner offers no grounds for her claim that were not already considered and rejected by the Fourth Circuit when it affirmed Judge Chasanow's findings that the March 2011 affidavit set forth probable cause that the seized assets were tainted and that the seizure was pursuant to an investigation for which Petitioner had not yet been indicted. *Johnson*, 683 F. App'x at 249–50. The Fourth Circuit reached this conclusion in spite of the fact that, six years after the seizure, the Government maintained that an indictment was forthcoming. *See id.* Nonetheless, the Fourth Circuit concluded, "this is far from a case in which the affidavit lacked a showing of probable cause to believe that the assets (or any of them) were in fact tainted," and "[t]he bottom line is that Johnson had no right to use illegally obtained funds to hire an attorney." *Id.* at 250 (citing *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624–33 (1989)).

Petitioner has presented no basis here for the Court to depart from the Fourth Circuit's decision. Even if the Court were inclined to consider new evidence of alleged Government misconduct at this stage, Petitioner's arguments present none, consisting entirely of insinuations of misconduct that the Fourth Circuit has already considered and dismissed. Accordingly, this claim will be rejected. Finally, Petitioner concludes the Motion to Vacate by asking the Court to consider whether the cumulative effect of her claimed errors merits relief even if none of the claims on their own require the Court to set aside her conviction. ECF No. 127 at 31. The Government responds that no such "cumulative prejudice" doctrine exists in the Fourth Circuit. ECF No. 128 at 20. The Court need not address this question of law, however, because even if such a doctrine existed, Petitioner's claims simply lack merit, whether considered independently or collectively. Therefore, Petitioner's § 2255 Motion to Vacate will be denied.

### 4.   Certificate of Appealability

When a district court dismisses a habeas petition, a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When, as the Court does here, a district court rejects constitutional claims on the merits, a petitioner satisfies the standard by demonstrating that "jurists of reason could disagree with the district court's resolution of [the] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)) (internal quotation marks omitted). As the Court has explained, none of the grounds Petitioner raised in support of her Motion were meritorious. Upon review of the record, the Court now finds that Petitioner has failed to demonstrate that "jurists of reason could disagree with" the Court's conclusions, and therefore Petitioner has failed to make the requisite showing to warrant a certificate of appealability. Accordingly, the Court declines to issue one.[4]

### B.   Petition for Writ of Error Coram Nobis

In her Petition for Writ of Error Coram Nobis, Petitioner asks the Court to "vacate the forfeiture and restitution judgment, and return Ms. Johnson her illegally seized funds." ECF No. 120 at 22. The Fourth Circuit described the nature of the writ of error coram nobis in *United States v. Akinsade*:

> As a remedy of last resort, the writ of error coram nobis is granted only where an error is "of the most fundamental character" and there exists no other available remedy. *United States v. Mandel*, 862 F.2d 1067, 1075 (4th Cir. 1988). The writ is narrowly limited to "'extraordinary' cases presenting circumstances compelling its use 'to achieve justice.'" *United States v. Denedo*, 556 U.S. 904[, 912] (2009) (quoting *United States v. Morgan*, 346 U.S. 502, 511 (1954)). Thus, the writ provides relief in cases

---

[4] Petitioner may still request that the Fourth Circuit issue such a certificate of appealability. 28 U.S.C. § 2253(c)(1); *Lyons v. Lee*, 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one).

> where the error "rendered the proceeding itself irregular and invalid."
> *United States v. Addonizio*, 442 U.S. 178, 186 (1979) (internal quotation
> marks and citation omitted) (superseded by statute on other grounds). A
> petitioner seeking this relief must show that "(1) a more usual remedy is
> not available; (2) valid reasons exist for not attacking the conviction
> earlier; (3) adverse consequences exist from the conviction sufficient to
> satisfy the case or controversy requirement of Article III; and (4) the error
> is of the most fundamental character." *Hirabayashi v. United States*, 828
> F.2d 591, 604 (9th Cir.1987).

686 F.3d 248, 252 (4th Cir. 2012).

The Fourth Circuit has found in multiple unpublished opinions that the writ of error

coram nobis is available only when a petitioner is no longer "in custody." *See, e.g.*, *In re Wilder*,

653 F. App'x 212, 213 (4th Cir. 2016) (per curiam). A petitioner serving a period of supervised

release remains "in custody" for purposes of coram nobis relief. *United States v. Smith*, 77 F.

App'x 180, 180 (4th Cir. 2013) (per curiam) (citing *United States v. Sawyer*, 239 F.3d 31, 37 (1st

Cir. 2001)). The U.S. Supreme Court has also stated that a petition for writ of error coram nobis

"provides a way to collaterally attack a criminal conviction for a person . . . who is no longer 'in

custody' and therefore cannot seek habeas relief under 28 U.S.C. § 2255 or § 2241." *Chaidez v.

United States*, 568 U.S. 342, 345 n.1 (2013). District courts within the Fourth Circuit have also

found that a petitioner who remains in custody may not seek coram nobis relief. *See Johnson v.

United States*, No. 4:01-cr-01003-CWH-1, 2016 WL 2659543, at *4 (D.S.C. May 9, 2016)

(collecting cases); *Parker v. United States*, Nos. WDQ-09-3360, WDQ-07-0447, 2010 WL

117743, at *1 (D. Md. Jan. 7, 2010).

Because Petitioner here remains on supervised release and is therefore "in custody," it

does not appear that she is eligible for coram nobis relief. *Smith*, 77 F. App'x at 180. Even if a

writ of coram nobis were available to Petitioner, however, she has failed to demonstrate that

relief is warranted. Petitioner offers two main arguments in her petition: first, that the "forfeiture

judgment" against her exceeded the amount she profited from the charged offenses and violated

a rule announced after her sentencing by the Supreme Court; and second, that she received

ineffective assistance of counsel at sentencing because counsel failed to challenge the accuracy

of the amount of restitution that the Government sought. ECF No. 120 at 2. The Court considers

each of these arguments in turn.

Petitioner's first argument is another attempt to litigate the March 2011 seizure of her

funds that this Court and the Fourth Circuit have already reviewed. Petitioner argues that she was

deprived of her "fundamental right to due process" because the Government never charged her

with the crimes it claimed justified the seizure and because she was never permitted an

evidentiary hearing to establish that the funds were untainted by any criminal conduct. *Id.* at 18.

She further contends that these errors "rendered the forfeiture proceedings fatally flawed." *Id.*

These arguments are unpersuasive, however, because they ignore the effect of prior rulings

against Petitioner and misconstrue the record in this case.

As the Government notes, there was no forfeiture imposed in Petitioner's cases pursuant

to which funds were seized. Rather, as Judge Chasanow concluded and the Fourth Circuit

affirmed, Petitioner's funds were seized pursuant to a separate investigation, *Johnson*, 683 F.

App'x at 249–50, and were later applied by the Government toward Petitioner's restitution debt

without objection by Petitioner, ECF Nos. 93, 107. Accordingly, any argument that "forfeiture

proceedings" in this case were flawed is premised on a mischaracterization of the proceedings

before the Court. ECF No. 120 at 18. Even if a forfeiture had taken place in this case, however,

Petitioner fails to demonstrate a persuasive legal basis for relief for several reasons. First, the

Fourth Circuit has expressed substantial doubt that a forfeiture may constitute a fundamental

error meriting coram nobis relief, regardless of the particular circumstances. *See United States v. Bazuaye*, 399 F. App'x 822, 824 (4th Cir. 2010) (per curiam).

Notably, Petitioner has pointed to no authority within the Fourth Circuit indicating that a writ of coram nobis is available not only to "attack[] [a] conviction," but also to challenge non-custodial elements of a criminal sentence. *Akinsade*, 686 F.3d at 252. And the authorities Petitioner does offer do not support her position. In *Kaminski v. United States*, the Second Circuit found that "coram nobis can relieve an individual of the continuing noncustodial effects of a criminal conviction only when *fundamental* errors were made in obtaining that conviction." 339 F.3d 84, 90 (2d Cir. 2003). Petitioner here does not assert that there were errors made in obtaining her conviction, but rather in reviewing the seizure of her funds pursuant to a separate investigation. Therefore, her reliance on *Kaminski*, and on *Barnickel v. United States*, 113 F.3d 704 (7th Cir. 1997), on which *Kaminski* draws for the same proposition about the scope of coram nobis relief, is misplaced.

Petitioner alternatively argues that the "forfeiture judgment" in her case violated the rule announced by the Supreme Court in *Honeycutt v. United States*, 137 S. Ct. 1626 (2017). As the Fourth Circuit explained in *United States v. Chittenden*, *Honeycutt* "held that 21 U.S.C. § 853(a)(1)—which mandates forfeiture of proceeds from certain drug crimes—limits such forfeiture 'to property the defendant himself actually acquired as the result of the crime.'" *United States v. Chittenden*, 896 F.3d 633, 636–37 (4th Cir. 2018) (quoting *Honeycutt*, 137 S. Ct. at 1635). In *Chittenden*, the Fourth Circuit found that *Honeycutt*'s holding applies equally to 18 U.S.C. § 982(a)(2), "a general criminal forfeiture statute that mandates forfeiture for a much broader range of crimes" than the drug crimes at issue under 21 U.S.C. § 853(a)(1). *Id.* at 638–39. Summarizing its holding, the Fourth Circuit explained that "forfeiture under 18 U.S.C.

25

§ 982(a)(2) is limited to property the defendant acquired as a result of the crime. The statute does not permit courts to hold a defendant liable for proceeds that only her co-conspirator acquired." *Id.* at 639.

Petitioner here was convicted of violations of 18 U.S.C. §§ 1014 and 1343, offenses that appear in the list to which § 982(a)(2)(A) applies. ECF No. 86; *see* 18 U.S.C § 982(a)(2)(A) (listing violations of "section 215, 656, 657, 1005, 1006, 1007, 1014, 1341, 1343, or 1344" of Title 18 of the U.S. Code, as well as "a conspiracy to violate" any of those sections). Accordingly, it appears that *Honeycutt*, as interpreted by the Fourth Circuit, would apply to any forfeiture imposed as a consequence of Petitioner's convictions. But that conclusion does not entitle her to relief. As stated previously, there was no forfeiture order in the Court's Judgment. ECF No. 86. Instead, the funds that Petitioner asks the Court to order the Government to return were seized pursuant to a separate investigation – lawfully, as the Fourth Circuit has concluded – and were later applied, without her objection, toward her restitution debt. ECF No. 107. *Honeycutt* thus has no bearing on Petitioner's case and offers no support for her Petition for coram nobis relief.

Perhaps anticipating this result, Petitioner additionally argues that the Court should vacate its restitution judgment because it was entered as a result of ineffective assistance of counsel. Petitioner specifically asserts that her sentencing counsel should have investigated the sales history of the properties that were purchased using the credit histories Petitioner fabricated, discovered information indicating that the losses presented in her Presentence Report were inflated, and informed the Court of that issue at the sentencing hearing. ECF No. 120 at 21. In support, Petitioner offers the results of Zillow.com searches for the subject properties and argues that the difference between the amount lenders wired to fund the fraudulent mortgage loan for

26

each property and the price the property was resold for after foreclosure is significantly less than the amount of loss claimed. *Id.* at 10–14, 20–21.

As noted previously, in addition to offering documentation of the losses claimed by each of the lenders, the Government at sentencing presented testimony from Agent Bannister explaining and corroborating the claimed loss amounts. ECF No. 102 at 82–84, 95–96. Agent Bannister was then cross-examined by Petitioner's counsel and offered further detail. *Id.* at 84–95. Following the testimony, the Court stated that "there has been evidence sufficient to establish in the Court's mind, certainly by preponderance of the evidence, and, frankly, greater than that," that the loss amounts the Government presented were accurate. ECF No. 102 at 120. The Court also noted that under the applicable Sentencing Guidelines provision, the Government need only provide "a reasonable estimate" as to the loss amounts. *Id.*; *see United States v. Jones*, 716 F.3d 851, 861 (4th Cir. 2013) ("The Sentencing Guidelines recognize that computing the losses caused by a fraud will often be an inexact calculation, which is why a 'court need only make a reasonable estimate.'" (quoting U.S.S.G. § 2B1.1 cmt. n.3(C)).

In its Opposition to the Petition, the Government provides a detailed explanation and an exhibit demonstrating the loss calculation for one of the properties, located at 5407 Illinois Avenue NW in Washington, D.C. ECF No. 128 at 24–25 & n.5; ECF No. 128-1. The Government agrees with Petitioner's assertion that the property was resold for $355,000 following foreclosure. ECF No. 120 at 10–11; ECF No. 128 at 25 n.5. But the Government demonstrates that merely subtracting that amount from the amount the lender wired for the fraudulent loan, $460,000, as Petitioner does, oversimplifies the loss calculation. In fact, as the Government's exhibit illustrates, there were two mortgages in default on the property, totaling $575,000, and while the property sold at foreclosure for $355,000, after paying taxes, fees, and

27

other transaction costs, the lender ultimately suffered a loss totaling $290,954, the amount ordered at sentencing. ECF No. 128 at 25 n.5; ECF No. 128-1.

Petitioner does not respond to these calculations or challenge their accuracy in her Reply, ECF No. 136, and offers no other basis for the Court to revisit or doubt its conclusions at the sentencing hearing. Therefore, evaluating the performance of Petitioner's sentencing counsel under the *Strickland* framework, Petitioner has failed to demonstrate that but for counsel's purported error, there is a reasonable probability that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Nor has Petitioner set forth grounds to find that counsel's performance was deficient. Petitioner merely makes the conclusory assertion that "[a] reasonable attorney would have investigated the sales history of the properties in advance of the sentencing hearing and presented that information to the Court." ECF No. 120 at 21. Given that the sales history investigation Petitioner now suggests – Zillow.com searches – would have yielded less accurate information than the Government's documentation, which was provided directly by the affected lenders, there is no basis to find that counsel acted deficiently. Therefore, Petitioner's ineffective assistance claim does not support coram nobis relief, and her Petition will accordingly be denied.

## III.    CONCLUSION

For the foregoing reasons, Petitioner's Motion to Vacate pursuant to 28 U.S.C. § 2255, ECF No. 119, and Petition for Writ of Error Coram Nobis, ECF No. 120, will be denied. A separate Order shall issue.


Date: <u>June 16, 2020</u>                                      /s/_____
                                                          GEORGE J. HAZEL
                                                          United States District Judge